James Tierney and Jeffrey Tierney, appellants,
v. Four H Land Company Limited
Partnership et al., appellees.
___ N.W.2d ___

Filed July 18, 2014.    No. S-13-720.

1.  **Specific Performance: Equity: Appeal and Error.** An action for specific performance sounds in equity, and on appeal, an appellate court decides factual questions de novo on the record and will resolve questions of fact and law independently of the trial court's conclusions.
2.  **Specific Performance: Contracts.** Specific performance may be granted only where there is a valid, legally enforceable contract and the party seeking specific performance has substantially complied with the terms of that contract.
3.  **Contracts.** Whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses.
4.  **Contracts: Words and Phrases.** A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible, at least two reasonable but conflicting interpretations or meanings.
5.  **Specific Performance: Contracts: Equity.** Specific performance should be granted, as a matter of course, of a written contract cognizable in equity, which has been made in good faith, whose terms are certain, whose provisions are fair, and which is capable of being enforced without hardship, where the ends of justice will be subserved thereby.
6.  **Specific Performance: Equity.** A court's discretion to order specific performance is controlled by established principles of equity and depending upon the facts and circumstances of the particular case. It is not a discretion in the sense that it may be granted or denied at the will or pleasure of the judge. It is governed by the elements, conditions, and incidents that control the administration of all equitable remedies.
7.  ____: ____. Exoneration from specific performance may be available when specific performance would be inequitable or unjust due to hardship on the one from whom performance is sought.
8.  **Specific Performance: Contracts.** Hardship arising from a circumstance unforeseeable at entry into a contract may excuse specific performance of a contract, provided that the hardship is not self-inflicted or caused through inexcusable neglect on the part of the person seeking to be excused or exonerated from specific performance.
9.  **Contracts.** A contract is not invalid, nor is the obligor therein in any manner discharged from its binding effect, because the contract turns out to be difficult or burdensome to perform.
10. ____. If a party by his own contract creates a duty or imposes a charge on himself, he must under any and all conditions substantially comply with the undertaking.
11. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Lincoln County: William T. Wright, Judge. Reversed and remanded with direction.

James J. Paloucek, of Norman, Paloucek & Herman Law Offices, for appellants.

Jay C. Elliott, of Elliott Law Office, P.C., L.L.O., for appellees Four H Land Company Limited Partnership and Western Engineering Company, Inc.

David W. Pederson, of Pederson Law Office, and Lou Jungbauer, of Yaeger, Jungbauer & Barczak, for appellees Frank Aloi and Aloi Living Trust.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, and Miller-Lerman, JJ.

Wright, J.

## NATURE OF CASE

In 1998, James Tierney and Jeffrey Tierney entered into an agreement with Four H Land Company Limited Partnership (Four H) and Western Engineering Company, Inc. (Western), regarding operation of a sand and gravel pit on property owned by Four H. In this agreement, the Tierneys agreed to waive their right to contest the issuance of a conditional use permit (CUP) for operation of the sand and gravel pit. In return, Four H and Western accepted various conditions regarding operation of the sand and gravel pit, including reclamation of the property after expiration of the CUP.

In 2009, the Tierneys brought an action for specific performance. They alleged that Four H and Western had not fulfilled the conditions of the agreement. The district court concluded that specific performance was not an appropriate remedy and dismissed the Tierneys' action. We reverse, and remand with direction to order specific performance.

## SCOPE OF REVIEW

[1] "[A]n action for specific performance sounds in equity, and on appeal, we decide factual questions de novo on the record. We will resolve questions of fact and law independently

of the trial court's conclusions." *Mogensen v. Mogensen*, 273 Neb. 208, 212, 729 N.W.2d 44, 50 (2007).

## FACTS

### BACKGROUND

This case involves a parcel of real estate previously owned by Four H and currently owned by the Aloi Living Trust and its trustee. Henceforth, this real estate will be referred to as "the property." Under county zoning, the property was located within an "A-1 Agricultural District" and historically had been a hayfield. The Tierneys own lots 3 and 4 of the Hidden Lakes subdivision in Lincoln County, Nebraska, located immediately south of the property.

### 1997 CUP

In 1997, Four H applied for a CUP to operate a sand and gravel pit on the property. The application was approved by the Lincoln County Planning Commission and the Lincoln County Board of Adjustment. The Tierneys appealed approval of the 1997 CUP to the district court, and in July 1998, the 1997 CUP was set aside due to the board of adjustment's failure to follow the correct procedures for issuance of a CUP under zoning regulations.

### 1998 CUP AND ACCOMPANYING AGREEMENT

Four H applied a second time for a CUP, and again, the Tierneys objected to the application. To resolve their dispute regarding the sand and gravel pit operation, in August 1998, Four H, Western, the Tierneys, and the owners of lots 1 and 2 of the Hidden Lakes subdivision entered into an agreement. The agreement provided that the Tierneys and the other property owners would "waive their right to appeal . . . the issuance of the [CUP] for the sand and gravel pit operation." In return, Four H and Western accepted various conditions to the operation of the sand and gravel pit.

Four H's application for a CUP was thereafter approved. The 1998 CUP was to be effective for a period of 10 years, terminating on October 31, 2007. The agreement integrated

the terms of the 1998 CUP, "except to the extent they [were] contrary to or less restrictive than the terms" of the agreement, in which case the agreement would control.

The relevant terms of the agreement provided:

> As the operation in one phase is completed and the operation moves to the next phase, [Four H] and [Western] shall reclaim the land in the phase of prior operations by filling to at least its approximate original topography, covered with a minimum of four (4) inches of top soil and seeded with appropriate native grasses to prevent erosion and to visually restore the site, except the area to be used for a lake. This shall be done within one (1) year of termination of operations on the phase. . . . In any event, reclamation and restoration of the property shall be completed by October 31, 2008. Restoration shall be the joint and several obligation of Four H . . . , Western . . . , and any other operator of the sand and gravel pit.

The relevant provision of the 1998 CUP provided:

> At the close of each phase of the sand and gravel pit operation the area shall be leveled to its original topography within one year of termination of each phase. The areas not covered by water shall then be covered with four inches (minimum) of topsoil and seeded with appropriate native grasses to prevent erosion of the soil.

This condition was incorporated into the 1998 CUP from the original 1997 CUP. This was required by the agreement, which provided that the 1998 CUP "shall include, at a minimum, the terms and conditions contained in the [CUP] approved by the Lincoln County Planning Commission on September 9, 1997, on the initial application of [Four H]."

### ACTION FOR SPECIFIC PERFORMANCE

In April 2009, the Tierneys filed an action for specific performance against Four H (prior owner of the property), Western (operator of the sand and gravel pit), and the Aloi Living Trust and its trustee (current owners of the property). The Tierneys alleged that Four H and Western had "failed to meet the requirements of the [1998 CUP]" or "their

obligations under the agreement." In particular, the Tierneys claimed that

> [u]nder the [1998 CUP] and the agreement, Four H and Western were required to, and agreed that they would, no later than October, 2008, return the area of the mining operation to its original topography. Instead, Four H and Western have raised the ground level of the majority of the area of the mining operation to approximately six feet to eight feet higher than the original topography.

The Tierneys prayed for an order requiring Four H and Western to specifically perform.

Four H and Western denied that they had failed to meet their obligations under the 1998 CUP or the agreement. They claimed to have "substantially complied with and performed the obligations and requirements of the 'Agreement' dated August 11, 1998." The Aloi Living Trust and its trustee also alleged that Four H and Western had complied with the 1998 CUP and the agreement.

## Summary Judgment
### Proceedings

All parties filed motions for summary judgment. After a hearing at which evidence was received, the district court entered summary judgment in favor of Four H, Western, and the Aloi Living Trust and its trustee. The Nebraska Court of Appeals affirmed the judgment. See *Tierney v. Four H Land Co.*, No. A-10-103, 2010 WL 4354243 (Neb. App. Nov. 2, 2010) (selected for posting to court Web site). We granted further review and reversed the judgment, because we determined that the district court judge should have recused himself. See *Tierney v. Four H Land Co.*, 281 Neb. 658, 798 N.W.2d 586 (2011). "Without addressing the underlying merits of th[e] dispute," we remanded the cause for a new hearing. *Id.* at 663, 798 N.W.2d at 591.

On remand, a different judge of the district court overruled all the motions for summary judgment. It was determined that the 1998 CUP and the agreement were ambiguous as they related to the requirements imposed upon Four H and Western

and that those ambiguities created genuine issues of material fact that prevented summary judgment.

## BENCH TRIAL AND DISTRICT COURT ORDER

The case proceeded to a bench trial, which was held over 4 trial days and included a "site visit." Thereafter, the district court dismissed the Tierneys' complaint for specific performance.

The district court explained its findings of fact as to the condition of the property:

> The evidence about the topography of the subject property before and after the mining is basically undisputed. Before the gravel mining started the property was relatively level with no significant rises or depressions, was farmed primarily as a hayfield, and essentially mirrored the lay of the land on the south side of the country road . . . which separates the mined property from property owned by . . . the Plaintiffs Tierneys. Now after mining operations have been terminated, the subject property has a lake of approximately 30 acres surface area and has, around the entire perimeter of the property, a continuous earthen berm that is elevated 5 to 10 feet above the natural topography and which is approximately 100 to 150 feet in width.

The court concluded that "[e]ssentially, none of the property is currently at the elevation it was before the mine. The encircling berm is elevated above the original topography and the lake is below the original topography."

The district court concluded that the 1998 CUP and the agreement were ambiguous "in the requirements they impose[d] on [Four H and Western]." The court found that the 1998 CUP and the agreement were susceptible to at least two interpretations. It explained:

> The [1997 and 1998 CUP's and the county zoning regulations] appear to impose an unconditional requirement for a return of the land to its original topography, i.e., its natural state. The August 11, 1998 Settlement Agreement

(which itself is incorporated into the [CUP] of the same
date) arguably allows [Four H and Western] to fill exca-
vated areas to a height above the natural topography, but
not less.

(Emphasis in original.)

To resolve this apparent conflict between the 1998 CUP and
the agreement, the district court examined the clause in the
agreement that integrated the 1998 CUP and the agreement.
The court noted the agreement stated that the terms and condi-
tions of the 1998 CUP applied "except to the extent they are
contrary to or less restrictive than the terms" of the agreement.
But according to the court, the "restoration requirements of the
Settlement Agreement are on their face 'less restrictive' in that
they do allow 'filling' of the excavated area above the original
topography, while the other documents require the area [to]
'be leveled to its original topography.'" Ultimately, the court
found that the intention of the parties was to adopt the more
restrictive requirement, even if it was in the 1998 CUP and not
the agreement.

The district court concluded that the "most reasonable
objective manifestation of the intention of the parties was the
restoration of the property to its original topography, except
for a small lake." Given this determination as to the intended
restoration of the property and the aforementioned findings
as to the actual condition of the property, the court found that
Four H and Western had not met the requirements of the 1998
CUP and the agreement.

The district court next considered whether it should order
specific performance. It stated that specific performance
"would appear to be the only adequate remedy" due to the fact
that damages "would be uncertain and difficult, if not impos-
sible, to prove." However, the court ultimately concluded that
specific performance was not an appropriate remedy, because
the 1998 CUP and the agreement were not sufficiently certain
and definite and the burden upon Four H and Western out-
weighed the benefits to the Tierneys.

The district court applied a "heightened burden of certainty
and definiteness" to determine whether it should order specific

performance. It concluded the 1998 CUP and the agreement did not meet the requirements of certainty and definiteness, because identifying the intent of the parties as to restoration of the property had been "tortuous" and required interpreting the language of the agreement "in a way contrary to natural usage." (Emphasis in original.) Therefore, the court held that the 1998 CUP and the agreement were "not sufficient . . . to support specific performance."

The district court next discussed the "comparative benefits and burdens of a decree of specific performance," an analysis the court admitted had "never arisen in Nebraska." It concluded that the burdens on Four H and Western were "so out of balance" with the benefits to the Tierneys that the "overall result would be more spiteful than just." It stated that performance of the 1998 CUP and the agreement would be a project "massive in both scope and expense." Conversely, it concluded that the benefits to the Tierneys from specific performance would "essentially be aesthetic ones" and that even if specific performance were ordered, the Tierneys' "rural living circumstances [were] by no means guaranteed."

Given the "massive" burdens that specific performance would impose upon Four H and Western and the resulting "aesthetic" benefits to the Tierneys, the district court denied specific performance and dismissed the Tierneys' complaint.

The Tierneys timely appeal. Pursuant to our statutory authority to regulate the dockets of the appellate courts of this state, we moved the case to our docket. See Neb. Rev. Stat. § 24-1106(3) (Reissue 2008).

## ASSIGNMENTS OF ERROR

The Tierneys generally assign that the district court erred in failing to order specific performance of the 1998 CUP and the agreement. In particular, they assign, restated, that the court erred by (1) imposing a heightened burden of certainty and definiteness, (2) comparing the benefits and burdens of performance, and (3) allowing the property to exist in a state that violated a condition of the 1998 CUP and applicable county zoning regulations.

## ANALYSIS

[2] The question presented is whether the district court erred by not ordering specific performance. Specific performance is an appropriate remedy only under certain circumstances. Specific performance may be granted only where there is a valid, legally enforceable contract, see *Marten v. Staab*, 249 Neb. 299, 543 N.W.2d 436 (1996), and the party seeking specific performance has substantially complied with the terms of that contract, see *Pennfield Oil Co. v. Winstrom*, 272 Neb. 219, 720 N.W.2d 886 (2006). There must be no adequate remedy at law for breach of the relevant contract. See *Brown v. Knox*, 219 Neb. 189, 361 N.W.2d 540 (1985). Where a contract relates to real property, the inadequacy of a remedy at law is assumed. See *Mohrlang v. Draper*, 219 Neb. 630, 365 N.W.2d 443 (1985).

In the instant case, the district court found that the "most reasonable objective manifestation of the intention of the parties" was for the property to be restored to its original topography, except for a small lake. It also determined that (1) after completion of the sand and gravel pit operation, Four H and Western left the property at a higher elevation than before, in breach of the 1998 CUP and the agreement; (2) the Tierneys had no adequate remedy at law for Four H's and Western's breach; and (3) if the court were to order specific performance, it would order Four H and Western to

> return the topography to its natural condition of a largely level field of approximately 2770 feet elevation on the west side, gently sloping to an elevation of approximately 2765 feet on the east side, leaving a kidney-shaped lake of approximately 11 acres of surface area in the middle of the property and then cover the areas, other than the 11-acre [lake], with a minimum of 4 inches of topsoil and plant native grasses.

Four H and Western did not file a cross-appeal to challenge these findings.

After making the above findings of fact, the district court declined to order specific performance, because it found that the 1998 CUP and the agreement were not sufficiently certain and definite to support specific performance and that the

benefits of performance were greatly outweighed by the burdens of restoring the property to its original topography. We review factual questions de novo on the record and resolve questions of law independently of the district court. See *Mogensen v. Mogensen*, 273 Neb. 208, 729 N.W.2d 44 (2007). We conclude as a matter of law that the court erred in not ordering specific performance.

## Heightened Burden of Certainty and Definiteness

The district court's first reason for denying specific performance was that the 1998 CUP and the agreement did not meet a "HEIGHTENED BURDEN OF CERTAINTY AND DEFINITENESS." The court found that the 1998 CUP and the agreement were ambiguous as to whether the property had to be returned to its original topography or could be returned to "at least" its original topography. Given this ambiguity, the court concluded that the 1998 CUP and the agreement were not sufficiently certain to support specific performance. We disagree.

The conditions of the 1998 CUP and the agreement, considered in pari materia, were unambiguous and clearly indicated that upon completion of the sand and gravel pit operation, Four H and Western were required to return the property to its original topography. Therefore, the terms of the 1998 CUP and the agreement were sufficiently certain and definite to allow for specific performance.

The agreement required Four H and Western to reclaim the property after each phase of the sand and gravel pit operation by "filling to at least its approximate original topography . . . except the area to be used for a lake." In terms of reclamation, the 1998 CUP imposed a stricter requirement upon Four H and Western than the agreement. The 1998 CUP required that after each phase of the operation, the property would be "leveled to its original topography." The final elevation of the property could be neither higher nor lower than the elevation prior to the sand and gravel pit operation, except for the lake.

[3] When viewed alone, the agreement arguably might be susceptible to two interpretations. It mentions "filling" the

property, but not leveling, and uses the qualifier "at least." But the requirements of the agreement cannot be interpreted alone. Whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses. *Hearst-Argyle Prop. v. Entrex Comm. Servs.*, 279 Neb. 468, 778 N.W.2d 465 (2010). This is particularly true in the instant case, where the parties integrated the 1998 CUP into the agreement.

We must view the agreement in connection with the 1998 CUP, even though the 1998 CUP is more restrictive in its reclamation requirements. The parties were required to comply with the provisions of both the 1998 CUP and the agreement. The only exception was that the parties would not be bound by a requirement of the 1998 CUP that was "contrary to or less restrictive than the terms" of the agreement. But the 1998 CUP could be more restrictive than the agreement. The requirements of the 1998 CUP were imposed by county zoning regulations. Therefore, because the reclamation provision of the 1998 CUP was more restrictive than the agreement, not less, it was binding upon the parties.

[4] A contract is ambiguous when a "word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." *Beveridge v. Savage*, 285 Neb. 991, 996, 830 N.W.2d 482, 487 (2013). When viewed in conjunction with the 1998 CUP, the agreement was susceptible of only one reasonable interpretation—that upon completion of the sand and gravel pit operation, Four H and Western were required to restore the property to its original topography. By incorporating the 1998 CUP into the agreement, the parties limited the actions that would comply with the agreement to the action required by the 1998 CUP. And the 1998 CUP clearly required a return to the original topography, as required by county zoning regulations.

Collectively, the 1998 CUP and the agreement unambiguously required a return to the original topography, except for a lake created by the extraction of gravel from the property. Both the 1998 CUP and the agreement required that reclamation of the property would occur in phases that coincided

with the phases of the sand and gravel pit operation. These phases were identified "on the site plan." The site plan was part of the application for the 1998 CUP and showed the final phase of the sand and gravel pit operation as leaving a lake that covered approximately 11 acres. The lake that remained would represent the volume of gravel that had been removed during operations. Because the parties referred to and relied upon the site plan in the agreement, we conclude that they agreed to the phases outlined in the site plan, including the 11-acre lake.

The 1998 CUP and the agreement set forth the core requirements for reclamation of the property and were sufficiently certain and definite to describe what was required of Four H and Western. The district court erred in concluding to the contrary.

## Comparison of Benefits and Burdens of Specific Performance

The second reason given by the district court for not ordering specific performance was that the burdens on Four H and Western outweighed the benefits to the Tierneys. The Tierneys assert that such a comparison of the benefits and burdens of specific performance "finds no support in Nebraska law" and "ignores clear Nebraska law on the applicability of specific performance as a remedy in cases involving real estate." Brief for appellants at 21 and 27. We agree.

[5,6] Specific performance should be granted, "'as a matter of course, of a written contract cognizable in equity, which has been made in good faith, whose terms are certain, whose provisions are fair, and which is capable of being enforced without hardship, where the ends of justice will be subserved thereby.'" *Kucera v. Kavan*, 165 Neb. 131, 138, 84 N.W.2d 207, 211 (1957), quoting *Garsick v. Dehner*, 145 Neb. 73, 15 N.W.2d 235 (1944). A court's discretion to order specific performance is

> controlled by established principles of equity and depending upon the facts and circumstances of the particular case. It is not a discretion in the sense that it may be

> granted or denied at the will or pleasure of the judge. It is governed by the elements, conditions, and incidents that control the administration of all equitable remedies.

*Mainelli v. Neuhaus*, 157 Neb. 392, 395-96, 59 N.W.2d 607, 610 (1953).

[7] Because specific performance must be granted or denied according to general equitable principles, concepts of fairness and equity can be considered. See *id*. In particular, "[e]xoneration from specific performance may be available when specific performance would be inequitable or unjust due to hardship on the one from whom performance is sought." *Mohrlang v. Draper*, 219 Neb. 630, 633, 365 N.W.2d 443, 447 (1985).

[8] But to the extent hardship enters into the equation, it is not compared to the benefits accruing to the party seeking performance. In analyzing whether hardship is sufficient to excuse performance under a contract, the question is whether the hardship complained of was foreseeable at entry into the contract. Hardship arising from a "circumstance unforeseeable at entry into the contract" may excuse specific performance of a contract, provided that the hardship is not "self-inflicted or caused through inexcusable neglect on the part of the person seeking to be excused or exonerated from specific performance." *Id*. at 634, 365 N.W.2d at 447. It is inconsequential to this analysis how the hardship compares to the benefits that would be obtained by the party seeking performance.

We adopted the foregoing approach to hardship, because under a contrary rule, "one would derive a benefit from his or her own inexcusable neglect." *Id*. For the same reasons, we decline to depart from our precedent and adopt the cost-benefit analysis used by the district court—that is, comparing the cost of performance to the benefits that would accrue to the party seeking specific performance.

Under an approach that weighs burdens and benefits of performance without considering the origins of those burdens, a party could be excused from specific performance due to the exact burdens it willingly and legally assumed under the contract. Furthermore, if the only relevant factor were the degree

of hardship, a party could derive positive benefits from creating impediments to its own performance, such as by engaging in compounded breaches of the contract, and would thereby be encouraged to do so.

The instant case illustrates the potential problems of the district court's approach to hardship. The court excused Four H and Western from their contractual obligations, because performance would require them to "shove a huge amount of earth back into" the lake created by the sand and gravel pit operation in order to return the property to its original topography. The court explained that this requirement was burdensome, because it would be a project "massive in both scope and expense," would require "pushing approximately 25 <u>acres</u> of fill material into the lake," and might require Four H and Western to obtain permits and licenses. (Emphasis in original.) We find it significant that these burdens were required by the 1998 CUP and the agreement and were the result of Four H's and Western's own actions.

The parties contemplated that performance by Four H and Western would require filling in a lake created by the sand and gravel pit operation. Indeed, the 1998 CUP and the agreement specifically required the lake to be filled in according to the site plan after each phase of the operation. The 1998 CUP and the agreement contemplated that restoring the property to its original topography would be the responsibility of Four H and Western and that they would obtain all the required permits. Thus, Four H and Western entered into the 1998 CUP and the agreement with knowledge that they would be taking on such burdens. They received the benefits of removing gravel from the property for 10 years and cannot now be excused from fulfilling their contractual obligations to restore the property due to the very burdens they intended to assume under the CUP and the agreement.

The 1998 CUP and the agreement required Four H and Western to return the property to its original topography at the conclusion of each phase of the sand and gravel pit operation. However, Four H and Western did not engage in this incremental restoration. Instead, the district court found that Four H

and Western pumped sand into a "pile 10 to 12 feet high that was continuously extended as the operation made its clockwise circle of the property." By doing so, Four H and Western continually enlarged the lake until it covered 30 acres instead of 11 acres, which, in turn, created an increased burden of performance. They cannot claim that increased burden as justification for excusing specific performance. Four H and Western chose not to refill the sand after each stage of the operation. Having created the massive pile of sand, they cannot now claim that it is just too big to clean up.

[9,10] The approach of the district court rewarded Four H and Western for failing to perform their obligations under the 1998 CUP and the agreement. Such a result is neither just nor equitable. Generally speaking, contracts must be enforced even when performance works hardship. Parties ""'bind themselves by their lawful contracts, and courts cannot alter them because they work a hardship. . . . A contract is not invalid, nor is the obligor therein in any manner discharged from its binding effect, because it turns out to be difficult or burdensome to perform."'" *Mohrlang v. Draper*, 219 Neb. 630, 634, 365 N.W.2d 443, 447 (1985), quoting *Wilson & Co., Inc. v. Fremont Cake & Meal Co.*, 153 Neb. 160, 43 N.W.2d 657 (1950) (ellipsis in original). ""'If a party by his own contract creates a duty or imposes a charge on himself, he must under any and all conditions substantially comply with the undertaking."'" *Id.*

The district court erred in engaging in a comparison of the benefits and burdens of performance. Its consideration of burdens should have extended no further than a determination whether the burdens were foreseeable or self-inflicted. Such an analysis of hardship would have revealed that Four H's and Western's burdens were both foreseeable and self-inflicted, and therefore did not provide a reason to excuse Four H and Western from their obligation to restore the property to its original topography. See *Mohrlang v. Draper, supra*.

Specific performance was an appropriate remedy for Four H's and Western's breach, and the district court should have ordered it. We reverse the judgment of the district court

and remand the cause with direction to order Four H and Western to

> return the topography to its natural condition of a largely level field of approximately 2[,]770 feet elevation on the west side, gently sloping to an elevation of approximately 2[,]765 feet on the east side, leaving a kidney-shaped lake of approximately 11 acres of surface area in the middle of the property and then cover the areas, other than the 11-acre [lake], with a minimum of 4 inches of topsoil and plant native grasses.

## OTHER ASSIGNMENTS OF ERROR

[11] Because we have determined that the district court's decision not to order specific performance should be reversed, we need not address the remaining assignments of error. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Carey v. City of Hastings*, 287 Neb. 1, 840 N.W.2d 868 (2013).

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court denying specific performance and remand the cause with direction to enter an order of specific performance.

REVERSED AND REMANDED WITH DIRECTION.

CASSEL, J., not participating.